**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PAMELA JANE DINGESS,**

      **Plaintiff,**

v.                                **Case No.: 3:13-cv-12562**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings. (ECF Nos. 13, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

1

I.    **Procedural History**

On September 10, 2010, Plaintiff, Pamela Jane Dingess ("Claimant"), filed an application for DIB, alleging a disability onset date of April 7, 2010, due to depression, bipolar disorder, panic disorder, leg problems due to hip replacement, and lower back problems. (Tr. at 139, 181). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 69, 80). Claimant filed a request for an administrative hearing, (Tr. at 85), which was held on November 7, 2011 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 34-66). By written decision dated December 23, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 15-27). The ALJ's decision became the final decision of the Commissioner on April 11, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 14, 15). Consequently, the matter is fully briefed and ready for resolution.

II.   **Claimant's Background**

Claimant was 38 years old at the time she filed the instant application for benefits, and 39 years old on the date of the ALJ's decision. (Tr. at 139). She has a GED and communicates in English. (Tr. at 182). Claimant has prior relevant work experience as a bank teller, a store manager, and a waitress. (*Id.*).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final

step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine

if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had engaged in substantial gainful activity from the alleged onset date, April 7, 2010, through August 13, 2010, but that she had not engaged in substantial gainful activity since August 14, 2010. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "arthritis of the hips, status/post left hip replacement; depression; anxiety; bipolar disorder; fibromyalgia; obesity; bilateral knee pain; lower back pain secondary to mild lumbar scoliosis and minimum disc protrusion at L5-S1; and minimal degenerative changes at the cervical spinal level." (Tr. at 17-18, Finding No. 3). The ALJ considered Claimant's other complaints and decided that her remaining impairments were either non-severe or not medically determined. (Tr. at 18).

Under the third inquiry, the ALJ found that Claimant did not have any impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-20, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). She must periodically alternate sitting and standing, standing no more than 20 minutes at a time. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold; extreme heat; and excessive vibration. She must avoid even moderate exposure to hazards such as moving machinery and unprotected

heights. The claimant retains the ability to learn and perform repetitive work-
like activity with minimal contact with co-workers and the public.

(Tr. at 20-25, Finding No. 5). At the fourth step, the ALJ determined that Claimant was
unable to perform any past relevant work. (Tr. at 25, Finding No. 6). Under the fifth and
final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in
combination with her RFC to determine her ability to engage in substantial gainful activity.
(25-27, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1972, and
was defined as a younger individual; (2) she had at least a high school education and could
communicate in English; and (3) transferability of job skills was not material to the
disability determination. (Tr. at 25-26, Finding Nos. 7-9). Given these factors, Claimant's
RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could
perform jobs that exist in significant numbers in the national economy. (Tr. at 26-27,
Finding No. 10). At the light level, Claimant could work as a monitoring machinist,
photographic machine operator, or inserting machinist; and at the sedentary level,
Claimant could work as a laminator, type copy examiner, or plastic design applier. (Tr. at
26). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social
Security Act, and was not entitled to benefits. (Tr. at 27, Finding No. 11).

## IV.   __Claimant's Challenge to the Commissioner's Decision__

Claimant argues that the ALJ improperly weighed the opinion of treating physician
Dr. Ahmed Faheem. (ECF No. 14 at 8-9). Claimant argues that Dr. Faheem's opinions
regarding the nature and severity of her impairments were entitled to either controlling or
great weight pursuant to Social Security Ruling 96-2p. (*Id.* at 9). Claimant also argues that
the ALJ improperly focused exclusively on Dr. Faheem's opinion of Claimant's physical
condition, and failed to consider Dr. Faheem's opinion as to her mental condition. (*Id.*).

In response, the Commissioner argues that the ALJ adequately reviewed and discounted Dr. Faheem's opinions as inconsistent with the overall medical record. (ECF No. 15 at 9-10). The Commissioner further notes that the ALJ adopted the mental RFC opinions of the state agency psychologists, and argues that the ALJ's determination that Claimant "retained the ability to learn and perform repetitive work-like activity with minimal contact with co-workers and the general public" adequately accommodates her mental limitations and is supported by the record. (*Id.* at 11).

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the evidence in its entirety, including all of the medical records. However, as the disputed issue in this case focuses on the limitations associated with Claimant's mental impairments, only records relevant to her mental health treatment and evaluation are summarized below.

### A.   **Appalachian Psychiatric Services Treatment Records**

Throughout the relevant time period, Claimant received psychiatric treatment at Appalachian Psychiatric Services every four to twelve weeks. She was treated primarily by Dr. Ahmed Faheem, but also attended appointments with various physician assistants.

On February 9, 2010, Claimant reported that she was "not doing too good" and had "been feeling more upset and more depressed." (Tr. at 367). Claimant reported poor sleep, increased irritability, mood swings, and depression. (*Id.*). She also relayed that she "had gone off on her boss the other day" and "feels bad about" the encounter. (*Id.*). Claimant's mental status examination was essentially normal. (*Id.*). Claimant was assessed with "major affective illness (depression)" and "anxiety disorder, NOS." (*Id.*). Dr. Faheem noted that Claimant was having significant panic attacks, and adjusted her medication accordingly, with instructions to follow-up in one month. (*Id.*).

7

On March 18, 2010, Claimant reported ongoing sleep difficulties, but "otherwise she [was] doing okay." (Tr. at 368). Claimant's mental status examination was normal. (*Id.*). Her diagnosis remained unchanged, and she was instructed to follow-up in three months. (*Id.*).

On June 30, 2010, Claimant reported "having a very difficult time," and stated that her moods had gotten worse since she underwent hip replacement surgery three months prior. (Tr. at 369). Claimant reported feeling very depressed and worrying about being sent back to work before she was physically ready. (*Id.*). Claimant was observed as tearful, but otherwise her mental status examination was essentially normal. (*Id.*). Claimant was instructed to return in three months. (*Id.*).

On July 29, 2010, Claimant reported "doing okay," although she was still having mood fluctuations. (Tr. at 370). Her mental status examination revealed impaired attention and concentration, but was otherwise normal, and her diagnosis remained unchanged. (*Id.*). Dr. Faheem adjusted Claimant's medication and instructed her to follow up in one month. (*Id.*).

Claimant returned to Dr. Faheem on August 12, 2010, before her regularly scheduled appointment. (Tr. at 371). She reported "not doing too good" in that she had "been getting more irritable, upset, and angry." (*Id.*). Claimant expressed frustration regarding her left hip and reported that she "ha[d] not been able to function at work and she ha[d] not been able to concentrate." (*Id.*). Dr. Faheem suggested that Claimant go to the hospital, but Claimant responded that "at the present time she cannot handle being around other[s] or being in the hospital." Claimant's attention and concentration remained impaired, and her diagnosis was unchanged. (*Id.*). She agreed to work on her feelings and return in two weeks. (*Id.*).

8

On September 2, 2010, Claimant reported that she was "still getting on the edge" and still gets depressed. (Tr. at 372). Claimant reported that she "has not been able to handle work" and that she "gets easily frustrated." (*Id.*). She also reported having "major problems in handling stressors and being around people in dealing with noises." (Tr.at 372). Claimant's attention and concentration were still impaired, and her diagnosis remained unchanged. (*Id.*). Dr. Faheem adjusted Claimant's medication, "helped her with supportive approaches" and instructed her to follow up in two months. (*Id.*).

On October 11, 2010, Claimant reported that "she still gets depressed," and "gets very frustrated," that she was not able to exert herself, and was easily irritable and upset. (Tr. at 516). Her mental status examination was unremarkable, except that her attention and concentration were impaired. (*Id.*). Claimant was assessed with "major affective illness, depression" and "anxiety disorder" with instructions to return in two months. (*Id.*). She requested that Dr. Faheem write a letter regarding her mental state and inability to work. (*Id.*).

On December 8, 2010, Claimant reported ongoing sleep difficulty, episodes of depression, mood fluctuations, and recurrent anxiety and panic attacks. (Tr. at 686). She stated that Xanax was not helping her anxiety and requested a change in medication. (*Id.*). Dr. Faheem adjusted Claimant's medication and instructed her to follow up in two months. (*Id.*).

On December 29, 2010, Dr. Faheem documented a telephone conversation with a physician reviewing Claimant under a Long-Term Disability Policy. (Tr. at 687). Dr. Faheem referenced his last progress note, stating that he "gave the impression that the patient is disabled from being gainfully employed." (*Id.*). He also indicated he did not believe Claimant would be able to return back to work, felt that she was still not stable, and

did not see her "going back to work at least for in [sic] an indefinite period of time." (*Id.*).

On February 3, 2011, Claimant reported that "she continues to have some depression" but that she felt her medications were working for her. (Tr. at 876). Claimant was observed as tearful at times, but otherwise her mental status examination was essentially normal. (*Id.*). Claimant's diagnosis remained unchanged, and she was instructed to follow up in two months. (*Id.*).

On March 28, 2011, Claimant reported that she "still has problems with depression" and that she was "under a lot of stress, trying to get her disability." (Tr. at 877). Claimant ceased taking Geodon because it was causing her heart to beat fast, and requested "to leave the medicine the way it is right now," stating that she was trying to do the best she could. (*Id.*). Claimant was observed as tearful at times, but otherwise her mental status examination was essentially normal. (*Id.*). Her diagnosis remained unchanged, and she was instructed to follow up in two months. (*Id.*).

On May 4, 2011, Claimant reported that she was "doing about the same" and that she "still gets down and depressed." (Tr. at 1059). Claimant stated that she "will get depressed and have crying episodes," but "doesn't feel that she needs to go into the hospital" and "has no thoughts of hurting herself." (*Id.*). Claimant's mental status examination was normal, and her diagnosis remained unchanged. (*Id.*). She was instructed to follow up in two months. (*Id.*).

On June 27, 2011, Claimant reported that her family doctor had adjusted her medication to treat her fibromyalgia. (Tr. at 1058). Claimant stated "that her mood is a little better than the last time that she was here" and that she had not had any recent crying episodes." (*Id.*).

On August 25, 2011, Claimant reported "that she is doing some better" and that although Cymbalta was not helping with her fibromyalgia, it seemed to be working along with her other psychiatric medication. (Tr. at 1057). Claimant's attention and concentration were observed as impaired, but otherwise her mental status examination was unremarkable. (*Id.*).

On October 21, 2011, Claimant reported that she was "still having panic attacks and a lot of anxiety" and did not feel that Klonopin was working. (Tr. at 1162). Claimant requested a change in medication, and reported that there were "no out of the ordinary problems going on other than her Social Security hearing coming up." (*Id.*). Claimant's mental status examination was stable, her diagnosis was the same, and she was instructed to follow up in two months. (*Id.*).

On November 14, 2011, Dr. Faheem provided a letter to Claimant's DIB counsel, in which he relayed that Claimant was in treatment with diagnoses of "Major Affective Illness, Depression and Anxiety Disorder NOS." (Tr. at 1160). Dr. Faheem noted that Claimant "says that she just cannot to *[sic]* be around people," and that she "continues to have problems with mood fluctuations, but mostly depression and panic attacks." (*Id.*). Dr. Faheem relayed that Claimant "is very uncomfortable in social situations," that she "cannot exert herself," she "still has problems with concentration," and that she was "still not able to handle pressures of working." (*Id.*). Dr. Faheem stated that Claimant "gets very emotional even when talking about the prospect of going to work because she knows she cannot handle it" and that she "goes all to pieces." (*Id.*). Dr. Faheem reported that Claimant was "still very unstable" and therefore opined "that she is disabled from being gainfully employed on an indefinite basis at least for the next year or more and she is not a candidate for successful rehabilitation." (*Id.*).

11

**B.     Evaluations and Opinions**

On September 14, 2010, Claimant's treating physician, Timothy Saxe, M.D., provided a physical evaluation and opinion regarding Claimant's functional limitations. (Tr. 376-80). The physical examination did not address Claimant's mental impairments, but in his written opinion Dr. Saxe did diagnose Claimant with depression, anxiety, bipolar disorder, and insomnia. (Tr. at 379). Regarding Claimant's physical RFC, Dr. Saxe opined that Claimant was "physically restricted, cannot sit more than 20-25 before pain, can stand 15 min or less, cannot walk only 5 min before weak and pain." (Tr. at 380). Regarding her mental impairments, Dr. Saxe opined that Claimant's "anxiety and depression make social interaction difficult" and stated that "she is having trouble making simple decisions or completing tasks." (*Id.*).

On October 19, 2010, Paula J. Bickham, Ph.D. provided a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Claimant. (Tr. at 567-84). Based upon Claimant's mental health treatment records, Dr. Bickham diagnosed Claimant with MDD and Anxiety Disorder NOS. (Tr. at 574, 576). Dr. Bickham opined that as a result of her mental impairments, Claimant was mildly limited in her activities of daily living; moderately limited in her ability to maintain social functioning and to maintain concentration, persistence, or pace; and had experienced no episodes of decomposition. (Tr. at 581). Accordingly, Dr. Bickham opined that Claimant did not satisfy any of the relevant Listing criteria. (Tr. at 582). Dr. Bickham observed that Claimant appeared partially credible. (Tr. at 583). Dr. Bickham noted that Claimant "reported on the [Adult Function Report] and to her [Treating Source] that she has difficulty with others in the work environment" and that her treatment notes "from June to September 2010 indicate that concentration was 'impaired.'" (*Id.*).

In her mental RFC opinion, Dr. Bickham opined that with respect to understanding and memory, Claimant was moderately limited in her ability to understand and remember detailed instruction, but not significantly limited in any other capacities. (Tr. at 567). Regarding her sustained concentration and persistence, Dr. Bickham opined that Claimant was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them; but not significantly limited in any other capacities. (*Id.*). Regarding social interaction, Dr. Bickham found Claimant to be moderately limited in her abilities to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from others, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; but not significantly limited in any other capacities. (Tr. at 568). Dr. Bickham also opined that Claimant was not significantly limited in her adaptation skills. (*Id.*). Thus, Dr. Bickham concluded that Claimant "retains the ability to learn and perform repetitive work-like activity with minimal contact with coworkers and the general public. (Tr. at 569).

On November 16, 2010, Dr. Faheem provided a letter addressed to Claimant's attorney, verifying that Claimant was receiving treatment from him for "Major Affective Illness, Depression" and "Anxiety Disorder, NOS." (Tr. at 670). Dr. Faheem described ongoing difficulties with "recurrent depression and anxiety, mood fluctuations, hopeless, helpless feelings, feeling tired, run down, getting easily irritated" and having "had problems in concentration and in handling stressors, particularly those related to work situations." (*Id.*). Dr. Faheem also reported Claimant's "problems with recurrent panic attacks with palpitations, smothering feelings, hyperventilation." (*Id.*). Accordingly, Dr.

13

Faheem opined that Claimant's "psychiatric problems and physical impairments together are such that the patient is considered to be disabled from being gainfully employed" and that "she is not a candidate for successful rehabilitation." (*Id.*).

On February 7, 2011, Jeff Boggess, Ph.D. provided a Psychiatric Review Technique and Case Analysis of Claimant. (Tr. at 697-710). Based upon Claimant's recent mental health treatment records, Dr. Boggess diagnosed Claimant with MDD and "Anxiety Disorder NOS, Panic Attacks." (Tr. at 700, 702). Dr. Boggess opined that as a result of her mental impairments, Claimant was moderately limited in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace; and had experienced no episodes of decomposition. (Tr. at 707). Accordingly, Dr. Boggess opined that Claimant did not satisfy any of the relevant Listing criteria. (Tr. at 708). In his Case Analysis, Dr. Boggess noted that Claimant alleged "increased panic symptoms upon reconsideration," whereas her follow-up notes from Appalachian Psychiatric Services "show[ed] same dx as initial," and Dr. Boggess noted that "a new AFR in file is essentially the same as upon initial." (Tr. at 696). Dr. Boggess observed that "as with initial, current AFT/MSS do not appear compatible with the claimant's self-reported ADL's." (Tr. at 696). Accordingly, Dr. Boggess affirmed as written Dr. Bickham's October 19, 2010 assessment. (*Id.*).

On September 28, 2011, Claimant's primary care provider Joanna Stover, PA-C provided a letter addressed to whom it may concern, in which she stated that Claimant suffers from severe osteoarthritis, which had led to a left hip replacement and an anticipated right hip replacement in the future. (Tr. at 1061). Ms. Stover also noted that Claimant "suffers from rather debilitating anxiety and depression" and opined that Claimant's "constant pain and decrease in activities due to her illness. . . have contributed

more to her depression as well." (*Id.*). Ms. Stover felt that Claimant had "made a good effort to promote improved health and well-being" but that there had been "limited improvement overall." (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775*.*

## VII.   <u>Discussion</u>

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ "for all practical purposes ignored the psychiatric evidence of record." (ECF No. 14 at 5). According to Claimant, the ALJ improperly discounted the

treatment notes and RFC opinion of her treating psychiatrist, Dr. Faheem. (*Id.* at 5-8). Claimant argues that Dr. Faheem's opinion was entitled to either controlling or great weight, pursuant to Social Security Ruling 96-2p. (*Id.* at 8-9). She does not offer any specific mental limitations that the ALJ failed to adopt, but instead argues that Dr. Faheem's treatment records and opinion that Claimant was disabled establish that the ALJ's opinion is unsupported by substantial evidence. (*Id.* at 10). The undersigned disagrees.

To begin with, Claimant's assertion that the ALJ ignored the relevant psychiatric evidence is simply untrue. In his decision, the ALJ specifically found that Claimant's anxiety, depression, and bipolar disorder were severe impairments, and evaluated them to determine that she did not satisfy the relevant Listing criteria. (Tr. at 17-20). In assessing Claimant's RFC, the ALJ summarized Claimant's testimony regarding her mental limitations, (Tr. at 23), and explicitly addressed Dr. Faheem's treatment notes, as well as his opinion that Claimant's "psychiatric problems and physical impairments together are such that the patient is considered to be disabled from being gainfully employed." (Tr. at 25). Rather than ignoring Claimant's relevant psychiatric records, the ALJ carefully reviewed Dr. Faheem's opinion, but discounted it as inconsistent with Claimant's treatment notes. (*Id.*).

Furthermore, Claimant's argument that Dr. Faheem's opinion was entitled to great or controlling weight under SSR 96-2p is unpersuasive, as Claimant conflates the way an ALJ must weigh medical opinions about a claimant's impairments with the way the ALJ considers opinions on issues reserved for the Commissioner. Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including

16

[her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). As Claimant notes, a medical opinion from a treating physician should be given controlling weight when the opinion is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; SSR 96-2p, 1996 WL 374188, at *2 (S.S.A. 1996). However, SSR 96-2p makes clear that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight." *See* SSR 96-2p, 1996 WL 374188, at *2.

In contrast, medical source opinions on issues reserved to the Commissioner, including whether a claimant is disabled,[1] are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2 (S.S.A. 1996). Nevertheless, these opinions must still be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *2-3. Thus, "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* at *3.

---

[1] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183, at *2.

In this case, Dr. Faheem's opinion that Claimant was "disabled from being gainfully employed" plainly constitutes an opinion on an issue reserved for the Commissioner. Therefore, the guidance provided in SSR 96-2p, which relates to "giving controlling weight to treating source medical opinions," is inapposite. SSR 96-2p, 1996 WL 374188, at *1. Moreover, it is evident from the written decision that the ALJ fully reviewed and considered Dr. Faheem's opinion letter and appropriately explained his rationale for discounting the opinion. Claimant argues that in rejecting Dr. Faheem's disability opinion, the ALJ focused on Claimant's physical impairments and failed to address her mental impairments. (ECF No. 14 at 9). However, this characterization would only be accurate if the ALJ's explanation were limited to the one sentence highlighted and described as "internally inconsistent" by Claimant. In truth, the ALJ's explanation preceded and followed that sentence and is best summed up by the ALJ's conclusion that Dr. Faheem's opinion on the disabling effects of Claimant's impairments was "inconsistent with the overall medical record that finds minimal, conservative treatment." (Tr. at 25). This finding undoubtedly related to Claimant's psychiatric care as much, if not more, than to her physical treatment. Claimant received counseling on a relatively relaxed 4 to 12 week schedule, had periodic symptomatic relief with medications, received no crisis care, had no psychiatric hospitalizations, and experienced no apparent episodes of decompensation. As the ALJ pointed out, Claimant went to church, shopped, and went to doctor's appointments. More importantly, she worked during most of the fifteen years she received psychiatric care.

Given that Dr. Faheem himself opined that Claimant's psychiatric problems and physical impairments *together* rendered her disabled, it was not inappropriate for the ALJ to address specific physical findings that were contrary to that level of impairment and to

generically note Claimant's sparse treatment records and limited objective findings. To the extent Dr. Faheem noted "specific psychiatric characteristics," (ECF No. 14 at 9), including "recurrent depression and anxiety, mood fluctuations, hopeless, helpless feelings, feeling tired, run down, getting easily irritated," (Tr. at 670), which were not explicitly addressed by the ALJ when discounting Dr. Faheem's disability opinion, the Commissioner correctly notes that these symptoms are "not quantifiable functional limitations that can be accommodated by the ALJ." (ECF No. 15 at 11). The ALJ had access to a mental RFC form prepared by an agency expert, which provided a function by function assessment of the impact of Claimant's psychiatric impairments on her ability to perform basic work-related activities. The ALJ considered this assessment in conjunction with the treatment records and other evidence, then adequately accounted for Dr. Faheem's observations of "problems in concentration and in handling stressors, particularly those related to work situations," (Tr. at 670), by limiting Claimant to "repetitive work-like activity with minimal contact with coworkers and the general public." (Tr. at 25). These mental limitations are similarly consistent with the agency expert's RFC opinions and Claimant's treatment notes reflecting impaired concentration and attention. (Tr. at 567-84, 697-710).

Accordingly, the undersigned **FINDS** that the ALJ did not err in discounting Dr. Faheem's opinion that Claimant was disabled. The undersigned further **FINDS** that the ALJ's RFC assessment was supported by substantial evidence.

### VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 13), **GRANT** Defendant's motion for judgment on the pleadings as

19

articulated in the Commissioner's brief, (ECF No. 15), **DISMISS** this action, **with prejudice,** and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  June 23, 2014.

Cheryl A. Eifert
United States Magistrate Judge